1
2
3
4

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-mail: swestcot@bursor.com

5
6
7
8

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
John J. Nelson (State Bar No. 317598)
Trenton Ross Kashima (State Bar No. 291405)
401 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

9
10
11
12

**KOPELOWITZ OSTROW PA**
Kristen Lake Cardoso (State Bar No. 338762)
1 West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Email: cardoso@kolawyers.com

13

*Attorneys for Plaintiffs*

14

15

16

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

17
18
19

ELLA HENNING and LEA AMMIANO,
individually and on behalf of all others
similarly situated,

              Plaintiffs,

20

       v.

21

LUXURY BRAND PARTNERS, LLC,

22

              Defendant.

Case No.: 3:22-cv-07011-TLT

**PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT FOR
VIOLATIONS OF:**

1. **STATE CONSUMER FRAUD
   ACTS;**
2. **FALSE ADVERTISING LAW,
   BUS. & PROF. CODE, § 17500;**
3. **UNFAIR COMPETITION LAW,
   BUS. & PROF. CODE, § 17200;**
4. **CONSUMER LEGAL
   REMEDIES ACT, CIV. CODE, §
   1770;**
5. **FLORIDA DECEPTIVE AND
   UNFAIR TRADE PRACTICES
   ACT, § 501.201, *et seq.*; and**
6. **UNJUST ENRICHEMENT, in the
   alternative.**

**DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

---

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-07011-TLT

Plaintiffs, Ella Henning and Lea Ammiano, individually and on behalf of all others similarly situated, by and through their attorneys, bring this amended class action complaint against Defendant, Luxury Brand Partners, LLC ("Defendant" or "LBP"), and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of IGK® branded Dry Shampoo (the "Products" or the "Dry Shampoo")[1] that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3.      Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their hair and scalp, Defendant knew or should have known that the Products contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including benzene on the Products' labels or otherwise warning about its presence.

4.      Plaintiffs and Class members reasonably relied on Defendant's representations that the Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5.      Plaintiffs and Class members purchased and used the Products and were therefore exposed to, or risked being exposed to, the harmful presence of benzene in the Products.

6.      The Products are worthless because they contain or risked containing benzene, a known human carcinogen that is an avoidable ingredient in the Products and Defendant's manufacturing process. Indeed, the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

---

[1] The Products refer to the following IGK's entire line of dry shampoos: Direct Flight Multi-Tasking Matcha Dry Shampoo; Jet Lag Invisible Dry Shampoo; and First Class Charcoal Detox Dry Shampoo.

7.     Defendant is therefore liable to Plaintiffs and Class members for selling the Products without disclosing that the Products contain or risk containing benzene.

## PARTIES

### Plaintiff Henning

8.     Plaintiff Henning is a resident and citizen of San Francisco, California. Plaintiff Henning has purchased numerous varieties of the Products over a period of approximately two years. The last time Plaintiff Henning purchased one of the Products for use was in approximately October, 2022, when Plaintiff Henning purchased the Jet Lag Invisible Dry Shampoo at a Sephora store located in San Francisco, California.

9.     When purchasing the Products, Plaintiff Henning reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for its intended use. Plaintiff Henning relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiff Henning would not have been willing to purchase the Products. The Products Plaintiff Henning purchased were worthless because they either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiff Henning was injured in fact and lost money as a result of Defendant's improper conduct.

### Plaintiff Ammiano

10.     Plaintiff Ammiano is a resident and citizen of Miramar, Florida. Plaintiff Ammiano has purchased Defendant's Products over a period of approximately one year. The last time Plaintiff Ammiano purchased one of the Products for use was in approximately March 2023, when Plaintiff Ammiano purchased the First Class Charcoal Detox Dry Shampoo at an Ulta store located in Pembroke Pines, Florida.

11.     When purchasing the Products, Plaintiff Ammiano reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for their intended use.

Plaintiff Ammiano relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiff Ammiano would not have been willing to purchase the Products. The Products Plaintiff Ammiano purchased were worthless because they either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiff Ammiano was injured in fact and lost money as a result of Defendant's improper conduct.

### *Defendant*

12.     Defendant is a corporation organized, existing, and doing business under and by virtue of the laws of the state of Florida with its principal place of business in Miami, Florida. Defendant markets and sells its IGK-branded haircare products, including the Products at issue, throughout the United States. The Products, including those purchased by Plaintiffs and Class members, is available at various retail stores throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

14.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff Henning and putative Class members, which arose out of the acts and omissions

that occurred in the state of California, during the relevant time period, at which time Defendant was engaged in business activities in the state of California.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District.

## DIVISIONAL ASSIGNMENT

16.    Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims herein arose in San Francisco County, California and this action should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

**I.    Defendant's History in the Industry**

17.    Defendant owns a portfolio of high-end beauty brands, including IGK.

18.    The IGK brand was founded in 2016 by a team of four hairstylists and positioned for the "social-media-obsessed Millenial."[2] The brand's products include shampoos, conditioners, styling products, and a variety of dry shampoos.

19.    According to Aaron Grenia, one of the brand's founders, IGK's three dry shampoos are designed to appeal to customer preferences by offering different levels of cleansing powder. "[IGK] created three dry shampoos – one with a lightweight cleanse (JET LAG Invisible Dry Shampoo, 1% cleansing powders), one with a medium cleanse (DIRECT FLIGHT Multi-Tasking Dry Shampoo, 3% cleansing powders) and one with a deep cleanse (FIRST CLASS Charcoal Detox Dry Shampoo, 7% cleansing powders)."[3]

20.    The dry shampoo market has grown dramatically in recent years and is currently

---

[2] https://www.wwd.com/beauty-industry-news/beauty-features/luxury-brand-partners-igk-product-sephora-10488650/ (last accessed Jan. 3, 2024).

[3] https://www.refinery29.com/en-gb/2018/02/189576/igk-haircare-uk (last accessed Jan. 3, 2024).

valued at approximately $4 billion dollars.[4] IGK has developed a dedicated following since its 2016 launch, and its dry shampoo products are frequently recommended to consumers by beauty magazines and industry experts.[5]

21.     Defendant's products, including the Dry Shampoo, are manufactured, distributed, and sold throughout the United States, including the State of California. The Products are sold at in store and online at mass market retailers and specialty beauty stores such as Target, Sephora, and Ulta.

22.     Defendant has gained the trust of consumers, who believe Defendant's promises that its Products are high-end, innovative, and salon-quality hair products.

23.     The Products at issue are dry shampoos, which are a product designed to absorb the dirt, oil, and grease of the scalp without washing it.[6]

24.     Dry shampoos are typically administered from an aerosol can and made with a base of alcohol or starch.  When applied to the hair, the dry shampoo soaks up the oil and grease, making it look cleaner. According to the IGK website, the Products are applied by spraying into hair and then massaging the Products into the scalp.[7]

25.     The U.S. Food and Drug Administration ("FDA") classifies and regulates shampoos, including dry shampoos like the Products, as cosmetics.

**II.     Benzene Is a Known Human Carcinogen**

26.     The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[8]

27.     The Department of Health and Human Services has determined that benzene causes

---

[4] https://www.factmr.com/report/4300/dry-shampoo-market (last accessed Jan. 3, 2024).
[5] *See, e.g.,* https://www.glamour.com/gallery/best-dry-shampoo (last accessed Jan. 3, 2024).
[6] https://www.webmd.com/beauty/what-is-dry-shampoo (last accessed Jan. 3, 2024).
[7] https://www.igkhair.com/collections/dry-shampoo/products/first-class-charcoal-detox-dry-shampoo (last accessed Jan. 3, 2024).
[8] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (last updated Dec. 6, 2023).

cancer in humans.[9]

28.    "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[10]

29.    Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[11]

30.    The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[12]

31.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[13]

III.    **Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated**

32.    The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[14]

33.    Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[15]

34.    The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable

[9] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[10] *Benzene and Cancer Risk*, American Cancer Society (last updated Feb. 1, 2023) https://www.cancer.org/cancer/cancer-causes/benzene.html.
[11] *Id.*
[12] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).
[13] *Facts About Benzene*, *supra*.
[14] *Id.*
[15] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last accessed Jan. 3, 2024).

1    toxicity effect.[16]

2        35.    Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has

3    stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts

4    per million ("ppm").[17]

5    **IV.    Exposure to Benzene in any Amount Is Extremely Dangerous**

6        36.    A 1939 study on benzene stated that "exposure over a long period of time to any

7    concentration of benzene greater than zero is not safe."[18]

8        37.    A 2010 study summarized the epidemiological studies of the carcinogenic effects

9    of benzene exposure and provided an overview of the hematotoxic effects of benzene.[19] The study

10    concluded:

11        a.    There is probably *no safe level* of exposure to benzene, and *all exposures* constitute

12            some risk in a linear, if not supralinear, and additive fashion.

13        b.    Exposure to benzene can lead to multiple alterations that contribute to the

14            leukemogenic process, indicating a multimodal mechanism of action.

15        c.    Benzene is a ubiquitous chemical in our environment that causes acute leukemia

16            and probably other hematological cancers.

17        38.    The CDC has stated that ways in which people "could be exposed to benzene"

18    include[20]:

19        a.    Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor

20            vehicle exhaust, and industrial emissions.

21

22    [16] David Light et al., *Valisure Citizen Petition on Benzene in Dry Shampoo Products* (Oct. 31,
     2022), https://assets-global.website-
23    files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citiz
     en%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf (the
24    "*Valisure Citizen Petition*").
     [17] *Id.*
25    [18] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene
     & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.
26
27    [19] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31
     Ann. Rev. Pub. Health 133 (2010), https://www.annualreviews.org/doi/full/10.1146/
     annurev.publhealth.012809.103646.
28    [20] *Facts About Benzene*, *supra*.

FIRST AMENDED CLASS ACTION COMPLAINT                                          7
CASE NO. 3:22-CV-07011-TLT

b.  Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

c.  The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

d.  Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

e.  People working in industries that make or use benzene may be exposed to the highest levels of it.

f.  A major source of benzene exposure is tobacco smoke.

39.    The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[21]

40.    "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[22]

41.    Benzene exposure from dry shampoo is especially troubling because the Product is applied to the scalp and around the face, with the remnants flying through the air likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

42.    In fact, inhaling benzene at levels of 0.4 parts per billion frequently over a lifetime might cause an additional cancer per 100,000 people.[23]

43.    The FDA allows for up to 2 parts per million of benzene in products where the use of benzene is "unavoidable" to produce a drug product with a significant therapeutic advance. However, dry shampoos are not a drug and contains no active pharmaceutical ingredient for therapeutic purpose; therefore, any significant detection of benzene in the Products could be

---

[21] *NIOSH Pocket Guide*, *supra*.

[22] *Facts About Benzene*, *supra*.

[23] https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf (last accessed Jan. 3, 2024).

deemed unacceptable.[24]

## V.    Discovery of Benzene in the Products

44.    Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure, an "independent laboratory"[25,] is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[26]

45.    In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238),"[27] and it is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[28]

46.    Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

47.    On October 31, 2022, Valisure reported its testing results for benzene in various types of dry shampoo utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[29]

48.    GC-MS "is generally considered one of the most accurate analyses available."[30]

---

[24] *See Valisure Citizen Petition, supra.*
[25] "About Us." https://www.valisure.com/about (last accessed Jan. 3, 2024).
[26] *Valisure Citizen Petition, supra.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last accessed Jan. 3, 2024).

Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[31]

49.    "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[32]

50.    Valisure analyzed 148 unique batches from 34 brands of dry shampoo.[33]

51.    Valisure identified ten brands of dry shampoo which contained levels of benzene at 2 ppm or higher, including the Products at issue in this case.[34]

52.    Valisure's testing results were confirmed by the voluntary recalls of several dry shampoo products manufactured by Procter & Gamble and Unilever which were found to contain benzene.[35]

53.    Valisure specifically measured benzene concentrations from 0.43 to 2.49 ppm in the Products:[36]

| Product Description | UPC | Lot | Benzene Concentration (ppm) |
|---|---|---|---|
| Direct Flight Multi-Tasking Matcha Dry Shampoo | 854253008616 | 19196 E | 2.49 |
| Jet Lag Invisible Dry Shampoo | 854569007402 | 21270A1 | .94 |
| Direct Flight Multi-Tasking Matcha Dry Shampoo | 854253008470 | 21021 A | .92 |
| First Class Charcoal Detox Dry Shampoo | 810021400518 | 2023516721 | .70 |

---

[31] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

[32] *Valisure Citizen Petition*, *supra*.

[33] *Id.*

[34] *Id.*

[35] https://www.cnn.com/2022/10/24/business/unilever-shampoo-recall (last accessed Jan. 3, 2024).

[36] *Valisure Citizen Petition*, *supra*.

| | 810021400518 | | |
|---|---|---|---|
| First Class Charcoal Detox Dry Shampoo | | RF9077 | .45 |
| First Class Charcoal Detox Dry Shampoo | 810021400518 | RF1181 | .43 |

54.     In at least one of the lots tested, the detected levels of benzene in the Products are greater than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[37]  However, because benzene is not a requisite component of manufacturing or packaging dry shampoo, its presence in the Products is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[38]

55.     David Light, Founder and Chief Executive Officer of Valisure, stated that "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[39]

56.     The Products are not designed to contain benzene, and no amount of benzene is acceptable in dry shampoo such as the Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists the ingredients on the Products' labels, Defendant failed to disclose on the Products' labeling or anywhere in Defendant's marketing that the Product contains benzene.

---

[37] *Id.*
[38] *Id.*
[39] *Id.*



57.     Despite its knowledge that the Products contain benzene, Defendant has failed to issue a voluntary recall of the Products.

## VI.     Benzene Renders the Product Adulterated, Misbranded, and Illegal to Sell

58.     "Dry shampoo products are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[40]

59.     The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of cosmetic products.[41]

60.     As cosmetic products regulated by the FDA, the Products are prohibited from being adulterated or misbranded. See FD&C Act, 21 U.S.C. §§ 361, 362.

61.     A cosmetic is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed

---

[40] *Valisure Citizen Petition*, *supra*.
[41] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT                                   12
CASE NO. 3:22-CV-07011-TLT

in the labeling thereof, or under such conditions of use as are customary or usual..." 21 U.S.C. § 361(a).

62.   A cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 362 (a).

63.   FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[42]

64.   In cosmetic products, the FDA has announced recalls of various products contaminated with benzene, including other dry shampoos.[43]

65.   Moreover, because dry shampoos are cosmetics and not drugs, they contain no active pharmaceutical ingredient for therapeutic purpose which might create an exception to the presence of benzene.

66.   Regardless, Defendant's Products contain levels of benzene above 2 ppm, including, in some cases, more than 7 times that limit.[44]

67.   Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

68.   The mere presence of benzene renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they "contains [a] poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof." 21 U.S.C. § 361(a).

69.   The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 362(a).

70.   A product that is "adulterated" or "misbranded" cannot legally be manufactured,

---

[42] *Valisure Citizen Petition*, *supra*.

[43] Food and Drug Administration. *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products* (December 17, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry-shampoo-spray (last accessed Jan. 3, 2024).

[44] *Valisure Citizen Petition*, *supra*.

advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

71.     California's Sherman Food, Drug, and Cosmetic Law has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by Cal. Health & Safety Code § 111670 mirrors the FDA definition, defining an adulterated cosmetic as one that "bears or contains any poisonous or deleterious substance that may render it injurious to users under the conditions of use prescribed in the labeling or advertisement of the cosmetic, or under conditions of use as are customary or usual." In fact, under the California law, cosmetics are required to satisfy all of the labeling requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 301, et seq.), and the federal Fair Packaging and Labeling Act (15 U.S.C. Sec. 1451, et seq.). See Cal. Health & Safety Code § 110371.

72.     It is unlawful in the state of California to distribute cosmetics if its packaging or labeling does not conform to the provisions of California and/or Federal law. Cal. Health & Safety Code § 110385.

73.     Further, it is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular. Cal. Health & Safety Code § 110390.

74.     It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded. Cal. Health & Safety Code § 110398.

75.     As alleged herein, Defendant has violated the FDCA; the Sherman Food, Drug, and Cosmetic Law; California's Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), and False Advertising Law ("FAL"); and various state consumer protection statutes. Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene contamination affecting the Products.

76.     If Defendant had disclosed to Plaintiffs and putative Class members that the Products contained or risked containing benzene and thus risked benzene exposure during use of the Products, Plaintiffs and putative Class members would not have purchased the Products or they

1    would have paid less for the Products.

2        77.    As a seller of a cosmetic, Defendant had and has a duty to ensure that its Products

3    did not and do not contain excessive (or any) level of benzene, including through regular testing,

4    especially before injecting the Products into the stream of commerce for consumers to use on their

5    hair and scalp. But based on Valisure's testing results set forth above, Defendant made no

6    reasonable effort to test its Products for benzene, despite its claims that the Products' ingredients

7    were tested for safety. Nor did it disclose to Plaintiffs in any advertising or marketing that its dry

8    shampoo contained benzene, let alone at levels that are many multiples of the emergency, interim

9    limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and

10   impliedly, that the Products were of merchantable quality, complied with federal and state law,

11   and did not contain carcinogens or other impurities such as benzene.

12   **VII.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of**
     **Material Facts Deceived Plaintiffs and Reasonable Consumers**

13       78.    The Products contains butane, isobutane and propane as propellants.

14       79.    Aerosols typically contain volatile hydrocarbons, like butane or isobutane, as

15   propellants. These propellants are derived from crude oil and manufactured in oil refineries where

16   a variety of other hydrocarbons, including benzene, are produced.

17       80.    Because the chemicals are derived from the same sources in the same facilities,

18   there is high potential for benzene contamination in the processing of butane and isobutane.

19       81.    Manufacturing companies that work with these volatile chemicals understand the

20   risks of benzene contamination.

21       82.    Defendant, a large, sophisticated corporation in the business of manufacturing,

22   distributing, and selling products containing aerosol propellants such as butane and isobutane,

23   knew or should have known of the risks of benzene contamination.

24       83.    Defendant's use of butane and isobutane as a propellant therefore put them on

25   notice of the risk of benzene contamination in the Products.

26       84.    Defendant sold, and continue to sell, dry shampoo products containing butane and

27   isobutane during the class period despite Defendant's knowledge of the risk of benzene

28

---

FIRST AMENDED CLASS ACTION COMPLAINT                                                    15
CASE NO. 3:22-CV-07011-TLT

contamination.

85.     Federal and state regulatory regimes require that cosmetics marketed on a retail basis to consumers contain a list of ingredients.[45] Failure to comply with this requirement renders a cosmetic misbranded under the FD&C Act and analogous state regulatory acts, including the California Sherman Food, Drug, and Cosmetic Law.

86.     Benzene is not listed on the Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

87.     Defendant has engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the Products, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene.

88.     The presence of benzene in the Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

89.     Had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the Products illegal to distribute, market, and sell.

90.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[46]

91.     Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

92.     By marketing and selling its body spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiffs and Class members, Defendant

---

[45] *See* 21 C.F.R. § 701.3
[46] https://monographs.iarc.who.int/list-of-classifications (last updated Dec. 6, 2023).

warrants that the Products are safe to use rather than adulterated body sprays containing a dangerous, cancer-causing chemical.

93.     Defendant did not disclose the actual or potential presence of benzene in its dry shampoo products on the Products' labeling, advertising, marketing, or sale of the Products.

94.     Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.

95.     Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiffs and Class members would not have purchased the Products.

## VIII.   Injuries to Plaintiffs and Class Members

96.     When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene. Not only would Plaintiffs not have purchased Defendant's Products had they known the Products contained benzene, but they would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities.

97.     Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

98.     Further, given IGK's position as a leader in the high-end hair care market, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

99.     Yet, when consumers look at the Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene. Indeed, these expectations are reasonable because if the

Products are manufactured properly, benzene will not be present in the Products.

100.    No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (which do not even apply to Defendant's Products).

101.    Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

102.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class members.

103.    Plaintiffs and Class members bargained for a dry shampoo product free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene—or at risk of containing the same—and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

104.    As alleged above, Plaintiffs and Class members' Products either contained benzene or were at significant risk of containing the same.

105.    Plaintiffs and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

106.    Plaintiffs individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

107.    Plaintiffs seek to represent a class defined as:

> All persons who purchased the Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

108.    Plaintiff Henning also seeks to represent a subclass defined as:

> All persons who purchased the Products in California for personal

or household use within any applicable limitations period ("California Subclass").

109. Plaintiff Ammiano also seeks to represent a subclass defined as:

All persons who purchased the Products in Florida for personal or household use within any applicable limitations period ("Florida Subclass").

110. Plaintiffs also seek to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[47]

111. Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

112. Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

113. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

114. *Commonality*: Questions of law or fact common to the Class include, without limitation:

a. Whether the Products contain benzene;

---

[47] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

b.  Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

c.  Whether Defendant knew or should have known that the Products contains benzene;

d.  Whether Defendant misrepresented whether the Products contains benzene;

e.  Whether Defendant failed to disclose that the Products contain benzene;

f.  Whether Defendant concealed that the Products contain benzene;

g.  Whether Defendant engaged in unfair or deceptive trade practices;

h.  Whether Defendant violated the state consumer protection statutes alleged herein;

i.  Whether Defendant was unjustly enriched; and

j.  Whether Plaintiffs and Class members are entitled to damages.

115.  *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

116.  *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

117.  *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer

management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

118.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF STATE CONSUMER FRAUD ACTS
**(On behalf of Plaintiffs and the Consumer Fraud Multi-State Subclass)**

119.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    Plaintiffs bring this Count on behalf of themselves and the Consumer Fraud Multi-State Subclass against Defendant.

121.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

122.    Plaintiffs and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiffs and Members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

123.    Defendant engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the Products, as discussed herein.

124.    Defendant intended that Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

125.    Given Defendant's position in the hair care market as an industry leader, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

126.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

127.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, BUSINESS &
PROFESSIONS CODE SECTION 17500 ("FAL")**
**(On behalf of Plaintiff Henning and the California Subclass)**

128.    Plaintiff Henning re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

129.    Plaintiff Henning brings this cause of action on behalf of herself and the California Subclass members against Defendant.

130.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

131.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

132.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Products misled consumers acting reasonably as to the presence of benzene in the Products or the risk thereof.

133.    At the time of its misrepresentations, Defendant was either aware that the Products contained benzene or was aware that it lacked the information and/or knowledge required to

truthfully represent that the Products would not expose Plaintiff Henning and consumers to the risk of benzene exposure. Defendant concealed and omitted and failed to disclose this information to Plaintiff Henning and Class members.

134.    Defendant's descriptions of the Products were false, misleading, and likely to deceive Plaintiff Henning and other reasonable consumers.

135.    Plaintiff Henning suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Products in reliance on Defendant's false and misleading labeling claims and omissions that the Products, among other things, are safe for use on the hair and scalp.

136.    Had Defendant disclosed the true nature of the Products, and the fact that it contains a chemical that is a known carcinogen associated with serious health consequences, Plaintiff Henning and California Subclass members would either not purchased the Products or would have paid substantially less for them.

137.    Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant have advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from its advertising.

138.    Defendant profited from its sale of the falsely and deceptively advertised Products to unsuspecting consumers.

139.    As a result, Plaintiff Henning, California Subclass members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched. Plaintiff Henning seeks such equitable relief, in the alternatively, should her legal remedies prove unavailable.

140.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff Henning, on behalf of herself and California Subclass members, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint. Injunctive relief is needed, as Defendant continues to misrepresent the true nature of the Products and continues to mislead the public. Additionally,

Plaintiff Henning has purchased the Products, and would be willing to purchase these Products again, if the risk of benzene exposure was eliminated.

**COUNT III**
**FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUSINESS &**
**PROFESSIONS CODE SECTION 17200 et seq. ("UCL")**
**(On behalf of Plaintiff Henning and the California Subclass)**

141.    Plaintiff Henning re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

142.    Plaintiff Henning brings this cause of action on behalf of herself and California Subclass members against Defendant.

143.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

144.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute business acts and practices.

145.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

    a.    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*.;

    b.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.;

    c.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ *301 et seq*.; and

    d.    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

146.    Defendant's conduct with respect to the labeling, advertising, and sale of the Products was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

147.    Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of: the Consumers Legal Remedies Act, the False Advertising Law, the Federal Food,

1    Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

2         148.    Further, the consumer injury was substantial, not outweighed by benefits to

3    consumers or competition, and not one consumer themselves could reasonably have avoided.

4         149.    A statement or practice is "fraudulent" under the UCL if it is likely to mislead or

5    deceive the public, applying an objective reasonable consumer test.

6         150.    As set forth herein, Defendant's claims relating the representations and omissions

7    stated on the Products' labeling and marketing statements mislead reasonable consumers regarding

8    the presence of benzene in the Products.

9         151.    Defendant profited from its sale of the falsely, deceptively, and unlawfully

10   advertised the Products to unsuspecting consumers.

11        152.    Plaintiff Henning and California Subclass members are likely to continue to be

12   damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate

13   misleading information on the Products' packaging. Additionally, Plaintiff Henning has purchased

14   the Products, and would be willing to purchase these Products again, if the risk of benzene

15   exposure was eliminated. Thus, injunctive relief enjoining Defendant's deceptive practices is

16   proper.

17        153.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff

18   Henning and the other California Subclass members. Plaintiff Henning has suffered injury in fact

19   as a result of Defendant's unlawful conduct, including economic injury.

20        154.    In accordance with Bus. & Prof. Code § 17203, Plaintiff Henning seeks an order

21   enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or

22   fraudulent acts and practices, and to commence a corrective advertising campaign.

23        155.    Plaintiff Henning and the Class also seek an order for and restitution of all monies

24   from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

25   Plaintiff Henning seeks such equitable relief, in the alternatively, should their legal remedies prove

26   unavailable.

27

28

**COUNT IV**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CIVIL CODE SECTION 1770 ("CLRA")**
**(On behalf of Plaintiff Henning and the California Subclass)**

156.   Plaintiff Henning re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

157.   Plaintiff Henning brings this cause of action on behalf of herself and California Subclass members against Defendant.

158.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

159.   Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiff Henning and Class members, and violated and continue to violate the following sections of the CLRA:

e.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

f.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

g.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

h.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

160.   Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unsuspecting consumers.

161.   Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

162.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff Henning provided written notice to Defendant on November 8, 2022 via certified mail through the United States Postal Service demanding corrective action pursuant to the CLRA. Defendant did not thereafter

1    correct its business practices.

2    163.    Venue is proper pursuant to Civil Code § 1780(d) because transactions giving rise

3    to this action occurred within this District. A Declaration of Plaintiff Henning establishing that this

4    Court is the proper venue for this action is attached as ***Exhibit A***.

5    164.    Pursuant to California Civil Code § 1780, Plaintiff Henning seeks injunctive relief,

6    monetary relief (including restitution and actual damages), reasonable attorney fees and costs, and

7    any other relief that the Court deems proper.

8                                                **COUNT V**
     **VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR**
9         **TRADE PRACTICES ACT, § 501.201, *et seq.* ("FDUTPA")**
            **(On behalf of Plaintiff Ammiano and the Florida Subclass)**

10    165.    Plaintiff Ammiano re-alleges and incorporates by reference all preceding factual

11    allegations as though set forth fully herein.

12    166.    Plaintiff Ammiano brings this cause of action on behalf of herself and Florida

13    Subclass members against Defendant.

14    167.    The FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable

15    acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

16    § 501.204(1). Fla. Stat.

17    168.    Plaintiff Ammiano and the Florida Subclass members are "consumers" within the

18    meaning of § 501.203(7), Fla. Stat.

19    169.    Defendant is engaged in the practice of manufacturing, marketing, distributing,

20    selling and otherwise placing into the stream of commerce the Products, which constitutes trade

21    and commerce as defined by § 501.203(8), Fla. Stat., and is therefore subject to FDUTPA.

22    170.    As alleged herein, Plaintiff Ammiano has suffered injury in fact and lost money as

23    a result of Defendant's conduct because she purchased Products from Defendant in reliance on

24    Defendant's representation that the ingredients in its Products were safe and effective and were

25    not adulterated with benzene, a known human carcinogen.

26    171.    As alleged herein, Defendant's actions are deceptive and in clear violation of

27    FDUTPA, entitling Plaintiff Ammiano and the Florida Subclass to damages and relief under §

28

1  501.201-213, Fla. Stat.

2  172.    Defendant has engaged, and continues to engage, in conduct that is likely to deceive

3  members of the public. This conduct includes representing in its labels that its Products contain

4  only the ingredients listed in the label, which is untrue, and failing to make any mention that the

5  Products are adulterated with benzene, a known human carcinogen.

6  173.    By committing the acts alleged above, Defendant has engaged in unconscionable,

7  deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of

8  FDUTPA.

9  174.    Defendant's conduct is substantially injurious to consumers. Consumers are

10  purchasing and using Defendant's Products without knowledge that the Products are contaminated

11  with a human carcinogen. This conduct has caused, and continues to cause, substantial injury to

12  consumers because consumers would not have paid for Products contaminated with benzene but

13  for Defendant's false labeling, advertising, and promotion. Thus, Plaintiff Ammiano and the

14  putative Class have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and

15  such an injury is not outweighed by any countervailing benefits to consumers or competition.

16  175.    Indeed, no benefit to consumers or competition results from Defendant's conduct.

17  Since consumers reasonably rely on Defendant's labeling of the ingredients and other information

18  disclosing what is contained in the Products and injury resulted from ordinary use of the Products,

19  consumers could not have reasonably avoided such injury.

20  176.    Injunctive relief is needed, as Defendant continued to misrepresent the true nature

21  of the Products and continues to mislead the public. Additionally, Plaintiff Ammiano has

22  purchased the Products, and would be willing to purchase these Products again, if the risks of

23  benzene exposure was eliminated. Plaintiff Ammiano is unable to rely on the Products' advertising

24  or labeling in the future to determine if the risk of benzene was eliminated.

25  177.    Further, Plaintiff Ammiano and the Florida Subclass seek an order enjoining

26  Defendant from continuing to conduct business through fraudulent or unlawful acts and practices

27  and to commence a corrective advertising campaign. Defendant's conduct is ongoing and

28  continuing, such that prospective injunctive relief is necessary.

178.    On behalf of herself and the Florida Subclass, Plaintiff Ammiano also seeks an order entitling her and the Florida Subclass to recover all monies spent on the Defendant's Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.

179.    In addition, the measure of restitution should be full refund of the purchase price insofar as the Products and their associated labels are worthless. But for Defendant's misrepresentations and omissions, Plaintiff Ammiano and Florida Subclass members would have paid nothing for Products containing benzene. Indeed, there is no discernable "market" for a dry shampoo product that is adulterated with a known human carcinogen. As a result, Defendant's Products are rendered valueless.

180.    Wherefore, Plaintiff Ammiano and Florida Subclass members are entitled to injunctive relief and equitable relief, and a full refund of the amount they spent on the Defendant's Products.

181.    Plaintiff Ammiano and Florida Subclass members are entitled to recover their reasonable attorney's fees pursuant to § 501.2105, Fla. Stat.

### COUNT VI
### UNJUST ENRICHMENT
### (In the Alternative)
### (On behalf of Plaintiffs and the Nationwide Class)

182.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

183.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class against Defendant.

184.    This claim is brought under the laws of the State of California.

185.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

186.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of Plaintiffs and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

187.    Plaintiffs and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which was not as Defendant represented them to be.

188.    Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiffs and Class members.

189.    It is inequitable for Defendant to retain the benefits conferred by Plaintiffs and Class members' overpayments.

190.    Plaintiffs and Class members seek establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually on behalf of themselves and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

a.  Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representative of the Class and Subclasses, and designating Plaintiffs' counsel as Class Counsel;

b.  Awarding Plaintiffs and Class members compensatory damages, in an amount to be determined at trial;

c.  Awarding Plaintiffs and Class members appropriate relief, including but not limited to actual damages;

d.  For restitution and disgorgement of profits;

e.  Awarding Plaintiffs and Class members reasonable attorneys' fees and costs as allowable by law;

f.  Awarding pre-judgment and post-judgment interest;

g.  For punitive damages; and

h.  Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: February 8, 2024                    Respectfully submitted,

                                           */s/ Sarah N. Westcot*
                                           **BURSOR & FISHER, P.A.**
                                           Sarah N. Westcot (State Bar No. 264916)
                                           701 Brickell Avenue, Suite 1420
                                           Miami, FL 33131
                                           Telephone: (305) 330-5512
                                           swestcot@bursor.com

                                           **KOPELOWITZ OSTROW, P.A.**
                                           Kristen Lake Cardoso (State Bar No. 338762)
                                           One West Las Olas Blvd., Suite 500
                                           Fort Lauderdale, FL 33301
                                           Telephone: (954) 525-4100
                                           cardoso@kolawyers.com

                                           **MILBERG COLEMAN BRYSON PHILLIPS
                                           GROSSMAN, PLLC**
                                           John J. Nelson (State Bar No. 317598)
                                           Trenton Ross Kashima (State Bar No. 291405)
                                           401 W. Broadway, Suite 1760
                                           San Diego, CA 92101
                                           Telephone: (858) 209-6941
                                           jnelson@milberg.com
                                           tkashima@milberg.com

                                           *Attorneys for Plaintiffs*
                                           *and the Putative Classes*